**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| ALLEN ROBERTSON, et al | ) | NO. 23-1494 |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| LOUISIANA BOARD OF PARDONS, et al | ) | MAG. JUDGE: |
| *Defendants* | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION TO ENJOIN THE LOUISIANA BOARD OF PARDONS FROM VIOLATING THE CIVIL RIGHTS OF DEATH ROW INMATES**

NOW INTO COURT come Plaintiffs through undersigned counsel who submit the instant *Memorandum in Support of Preliminary Injunction*. Plaintiffs move for a preliminary injunction enjoining the Louisiana Pardon Board's continued violation of Plaintiffs constitutional rights to due process by intentionally and willfully refusing to perform its ministerial act of scheduling Plaintiffs' clemency hearings and cancelling the clemency hearing that were scheduled. The Court must order Defendants to conduct the clemency hearings and issue its recommendation to the Governor no later than December 28, 2024. The Court must further order Defendants to conduct the clemency hearings in good faith without arbitrary denials not based on the record before them. Plaintiffs seek relief pursuant to Federal Rule of Civil Procedure 65.

I.        **BACKGROUND**

      a.      **Plaintiffs filing and Governor's lawful order**

In June and July of 2023, fifty-six (56) Death Row inmates filed applications for clemency with the Pardon Board, each seeking a reduction of their sentence to life without the possibility of parole.

On August 9, 2023, Governor John Bel Edwards directed the Louisiana Board of Pardons to schedule hearings for each of the 56 Clemency Applications that had been filed before it (the "Constitutional Directive"). As Governor Edwards stated in his letter to the Board,

> I am guided by my deep faith in taking my pro-life stance against the death penalty. Beyond moral justifications, there are a number of reasons, whether based in law or science that support the need for mercy while considering these applications. I believe we must consider further the imperfect nature of the criminal justice system and the actual innocence that has been proven far too often after imposition of the death penalty.[1]

The Governor's authority to direct the Board of Pardons to schedule hearings on the capital clemency applications is both constitutional and consistent with the Board's own policies. Board Policy 02-207 states that "[n]otwithstanding any provision to the contrary by Board policy, in **any case in which the death sentence has been imposed**, the Governor may at any time place the case on the agenda and set a hearing for the next scheduled meeting or at a specially called meeting of the Board."[2]

On August 10, 2023, the Board complied with the Governor's Constitutional Directive and began scheduling those hearings and issued notice to victims' families of the first twenty hearings (which the Pardon Board labeled as "Group 1," indicating its intention to set the remainder of applicants for hearing promptly thereafter). Such notices acknowledged that the hearings were set "in response to the Governor's request." The first twenty clemency hearings were scheduled for October 13th, 2023, November 8, 2023, November 13, 2023, and November 27, 2023.[3]

---

[1] *See* East Baton Rouge Parish District Attorney Pet. ("EBRDA Pet.") at ¶ 18 and Exhibit  thereto, Letter from the Governor to Sheryl M. Ranatza, Tony Marabella, Bonnie Jackson, Curtis "Pete" Fremin, Alvin Roche' Jr., Louisiana Board of Pardons (August 9, 2023), attached as Exhibit 1 and Exhibit 2.

[2] La. Bd. Of Pardons Board Policy 02-207-POL (Oct. 26, 2020) ("Board Policy 02-207"), attached as Exhibit 3.

[3] *See* Hearing Schedule, attached as Exhibit 4.

**b.      Attorney General collusion and overreach**

Attorney General Jeff Landry has asserted his influence over every aspect of the Board's review of these capital clemency applications. Soon after the Clemency Applications were first filed, in June 2023 the Attorney General announced his and his office's official opposition to the substance of those applications: "'I oppose clemency for all of these offenders who were given valid death sentences by juries of their peers,' [Attorney General Jeff] Landry said in a statement. 'My office will formally oppose their applications.'"[4] One month later, Attorney General Landry himself signed off on an Attorney General Opinion opining that the Board could not even ***hear*** the Applications that he had already announced he would substantively oppose. *See* A.G. Op. 23-0083 (July 18, 2023).

Thereafter, a representative from the Attorney General's office acted as counsel to the Board of Pardons. On July 24th, Assistant Attorney General Grant Willis appeared at a meeting of the Pardon Board as "Board of Pardons Attorney & Assistant Attorney General," and advised the Board in line with Attorney General Landry's opinion.[5] Shortly thereafter, the Board of Pardons' returned all capital clemency applications that it had previously agreed to hear.

Approximately one week later, the Governor issued his Directive to the Board to place the Clemency Applications on its calendar for hearings. Attorney General Landry quickly made public statements that Governor Edwards' actions were an insult to jurors and only the "first step," into allowing capital offenders to walk free:

> In seeking to commute the death sentences of these 56 convicted murderers, John Bel Edwards is attempting to overturn the decisions of 672 Louisiana jurors and 1,344 individual juror votes. These jurors took time from their families and jobs to go through weeks of intensive and stressful litigation. They had the courage to stand

---

[4] *See* James Finn, *Jeff Landry says he'll fight Louisiana death row prisoners' clemency pleas*, NOLA.COM, June 13, 2023, attached as Exhibit 5.

[5] *See* Minutes of the Pardon Board, August 14, 2023, attached as Exhibit 6.

up and vote in favor of the victims of these horrible crimes and render the appropriate death sentences. The criminals they convicted have murdered innocent people, including law enforcement officers. These cases involved intensive investigations by hundreds of law enforcement officers. Hundreds of family members and secondary victims suffered from those murders and were involved directly or indirectly with the trials. Numerous district judges presided over the lengthy and difficult trials – following the law in issuing the death sentences. The commutation to a life sentence is the first step in converting the sentences to a set period of time with eligibility for parole or release. So, as a lame duck governor with less than five months left on his term, John Bel Edwards seeks to insult the judgment of thousands of Louisiana citizens, law enforcement officers, judges, and crime victims.[6]

The following day the Board complied with the Governor's Directive and began scheduling clemency hearings for the capital applicants.

Over a month after the Governor's Directive and the Board's scheduling of the first rounds of hearings, District Attorney Hillar Moore filed for a Preliminary Injunction with the Nineteenth Judicial District Court, followed shortly by similar requests filed by Attorney General Jeff Landry, and the District Attorneys for Jefferson, Caddo, Natchitoches, Rapides, and DeSoto Parishes.

The Board of Pardons then sought independent counsel. The Board is typically represented by the Attorney General in legal proceedings. However, upon being made defendants in a civil suit filed by the Attorney General himself, the need for independent counsel was unquestionable, and the Board subsequently retained J. Arthur Smith, III as its independent attorney.

Mr. Smith prepared legal pleadings, approved by the Board, in which he correctly argued that "the relief requested by the Plaintiffs in the instant case 'would amount to an unconstitutional exercise of the governor's exclusive pardon power in violation of the doctrine separation of powers as provided in La. Const. Art. II, § 2'" (citing *State v. Lee,* 2022-KK-01827, 2023, La. LEXIS

---

[6] *See Gov. Edwards tells Pardon Board to consider clemency for death row inmates,* *https://www.kalb.com/2023/08/09/gov-edwards-tells-pardon-board-consider-clemency-death-row-inmates/* (10/10/2023), attached as Exhibit 7.

1649 (La. 09/08/23). Mr. Smith's pleadings prayed that "Plaintiffs Petition be dismissed with prejudice, at his cost."[7]

Mr. Smith also prepared to file a *Motion to Recuse* Attorney General Jeff Landry, arguing that Mr. Landry had a conflict of interest in filing a civil action against the Board while also acting as the Board's attorney. Mr. Smith noted that "[i]t is certainly conceivable, plausible, and reasonable that the public would believe that the Attorney General's suit against the Parole Board and its members is motivated, at least in part, by his own political agenda… The numerous conflicts that arise from the Attorney General's suit against his own clients clearly show that the Attorney General has 'a personal interest' in the case."[8]

Mr. Smith then notified the Attorney General of his intention to raise the conflict of interest. Attorney General Landry responded by dismissing Mr. Smith as the Board's attorney. Via letter, Attorney General Landry stated, "[y]our letter indicating that a conflict exists calls into question your competency as a lawyer."[9] The Attorney General further stated, "[y]ou are not authorized to serve as legal counsel. My office can appoint special counsel for the Board if needed or the Department of Public Safety and Corrections attorneys can handle the matter in house."[10]

The following day Judge Donald Johnson of the Nineteenth Judicial District Court convened a status conference with the parties via zoom. Mr. Smith participated in the status conference and informed the Court that he had received a letter from Attorney General Landry and was therefore unsure of his status as counsel for the Board. Separately, attorneys from the firm

---

[7] *See* Defendant's Exception of No Cause of Action and Lack of Subject Matter Jurisdiction and Memorandum in Support thereof, at 1, attached as Exhibit 8.

[8] *See Defendant's Motion to Recuse Attorney General and Memorandum in Support thereof*, at 3, attached as Exhibit 9.

[9] *See Letter from Attorney General Jeff Landry to J. Arthur Smith, III* (Sept. 26, 2023), at 1, attached as Exhibit 10.

[10] *Id.* at 2.

Sher Garner Cahill Richter Klein & Hilbert, L.L.C ("Sher Garner") also appeared at the status hearing and stated that they had just been retained as attorneys for the Board.

The Court stated its intention to proceed with the hearing on the preliminary injunction the next day, September 28th. The Court asked the President of the Louisiana District Attorneys Association to contact any District Attorneys who were not present at the status conference, to ensure that they would appear the next day.

The following day District Attorneys from Desoto Parish and Caddo Parish did not appear in court. The Court stated its intention to move forward with the hearing, and to decide these critical issues. However, at the bench and off the record, the District Attorneys and Attorney General successfully argued that the hearing should be continued because all District Attorneys were not present and had not been served with this Court's Order to show cause why the related cases should not be consolidated. Furthermore, the new attorneys for the Board of Pardons represented that they had only recently been retained and were not sufficiently familiar with the issues to proceed.

Counsel for the capital clemency applicants notified the Court of his concerns that the Board's original counsel had been terminated by the Attorney General, and that potential conflicts of interest existed with the Attorney General's office and the Board's new counsel in this matter. . Although counsel was prepared to address that issue the same day, counsel for the Attorney General refused to waive formal service of any motions, and the Court was forced to delay the proceedings.

On September 28, just hours after court concluded, a notice was posted on the Pardon Board's website, scheduling a meeting of the Board for the following day (September 29th) to address the "pending litigations."[11]

On September 29, at 4:00pm the Pardon Board held a public meeting. Present were the Board's attorneys from the firm of Sher Garner, and representatives of the East Baton Rouge District Attorney's Office and the Office of the Attorney General. Counsel for the capital clemency applicants learned of the meeting less than an hour before it occurred, and requested permission to appear via zoom.

Only four members of the Board of Pardons were present. Board Member Bonnie Jackson did not attend. At the meeting, the Board went into executive session outside the presence of counsel for the capital clemency applicants. When they returned, one member of the Board moved for the Board to approve a settlement agreement (the "Settlement Agreement") to resolve all of the injunction cases brought by the Attorney General and District Attorneys. The four members of the Board who were present voted in favor of approving the Settlement Agreement.

The details of this Settlement Agreement were not stated in the open meeting.  The public— including counsel for the clemency applicants who was present via zoom—was not provided an opportunity to provide comment prior to the Board's vote approving the Settlement.

A partially executed copy of the Settlement Agreement was subsequently disclosed, which included the following relevant provisions:

- That the previously scheduled capital clemency hearings would be canceled and transformed into "administrative reviews." At these reviews members of the Board would determine if the applicant would be granted a hearing.

---

[11] *See Notice and Agenda for September 29, 2023 Meeting*, attached as Exhibit 11.

- That the Board's schedule for administrative reviews must remain the same, and that any clemency hearings granted must be held at least 60 days later. As a result, only 5 capital clemency applicants could even potentially receive a clemency hearing while Governor John Bel Edwards was in office

- That the Board would refuse even an administrative review any other capital Clemency Applications that were pending before them.

Two days after the Board voted in favor of the Settlement Agreement, all District Attorneys and the Attorney General voluntarily dismissed their requests for a preliminary injunction, with prejudice.

Upon information and belief, lawyers James Garner, Joshua Force, and their law firm Sher Garner, illegally represented Defendants. No record of any vote by Defendants to hire James Garner, Joshua Force and their law firm can be found. No resolution can be located. No written contract between Defendants and James Garner, Joshua Force, and their law firm can be found.

Even assuming some written attorney-client contract exists that predates the Settlement Agreement and was publicly voted on, James Garner, Joshua Force, and their law firm failed to obtain a written waiver from the Defendants of their conflicts of interest for concurrently representing the Attorney General in the State's opioids lawsuit, abortion lawsuit, and other lawsuits.[12] Upon information and belief, none of this was disclosed to Defendants, and no written waiver was obtained. Sher Garner has no experience in capital cases, criminal law, or clemency hearings. Sher Garner has never represented Defendants before. Sher Garner's appointment was facilitated and directed by the Attorney General.

---

[12] *See State v. Purdue Pharm L.P. et al.*, Case No. 661,638, Section 25; *State v. June Medical Services, LLC et al.*, Case No. C-720,988 Section 24.

8

**II.    Defendants must be enjoined from its continuous violation of the Governor's Directive.**

Federal Rule of Civil Procedure 65 empowers a party to obtain an injunction, preliminary and permanent, to stop the continued violation of a constitutional right. Fed. R. Civ. Proc. 65. Injunctions are appropriate in civil right cases. For a preliminary injunction to issue, the plaintiffs must satisfy four elements: (1) substantial likelihood of success on the merits; (2) substantial threat that the movers will suffer irreparable injury if the preliminary injunction is denied; (3) the threatened injury to movers outweighs the threatened injury to those who are the subject of the injunction; and (4) granting the preliminary injunction will not disserve the public interest. *Walgreen Co. v. Hood*, 275 F.3d 475, 477 (5th Cir. 2001).

In this case, Plaintiffs satisfy all four elements. First, Plaintiffs' constitutional rights are clearly established and rooted in fundamental state and federal due process. Second, Plaintiffs' very lives are at issue if the clemency hearings do not occur, since the Governor will not be afforded the opportunity to determine whether clemency is warranted. Third, Plaintiffs' threatened harm outweighs any alleged risk to the Defendants, since they would be ordered to perform the very function for which they exist. Fourth, granting the preliminary injunction will serve the public interest because it will confirm the Governor's constitutional powers of clemency.

**A.    Plaintiffs' claims are substantially likely to succeed on the merits.**

Plaintiffs' federal and state law claims will prevail on the merits. Defendants deliberately violated Louisiana law and the Pardon Board's own policies, practices, and procedures, knowing that it would result in the increased risk of execution of some or all of Plaintiffs. Defendants' conduct was intentional, deliberately indifferent, violated state and federal constitutions, and inconsistent with the Pardon Board's policies, practices, and procedures.

9

Defendants acted under pretense and color of state law in their individual and/or official capacities and within the scope of their respective employment.  Defendants' actions were beyond the scope of their jurisdiction, authority, and power, and were done willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendment of the United States Constitution.

The U.S. Constitution requires due process in state executive clemency proceedings, and § 1983 is the appropriate vehicle to seek this relief.  In *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998), a case brought pursuant to § 1983, the Supreme Court ruled that the federal Constitution—namely, the "life" interest protected by the Due Process Clause—requires some " minimal" degree of due process for death row inmates in state executive clemency proceedings. Although the Court did not specify the precise degree of due process required in state capital clemency, the Court said that "[j]udicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id*. at 289. Ultimately, the Court denied relief, ruling that Mr. Woodard's Ohio clemency proceedings did not violate the Due Process Clause, id. at 288, but the Court noted no procedural defect with bringing such challenges under § 1983.

The Fifth Circuit has since reviewed similar challenges under § 1983. *See*, *e.g.*, *Garcia v. Jones,* 910 F.3d 188 (5th Cir. 2018) *** In *Young v. Gutierrez*, the court announced that the decision in *Skinner v. Switzer*, 562 U.S. 521 (2011), constituted an intervening change in the law as to the standard determining when a claim is cognizable under § 1983. 895 F.3d 829, 830 (5th Cir. 2018); *see Skinner*, 562 U.S. at 525 ("Where the prisoner's claim would not 'necessarily spell speedier release,' . . . suit may be brought under § 1983."). The Fifth Circuit in *Young* recognized

that a challenge to clemency proceedings would not "spell speedier release," and, if successful, the proceedings would result only in the plaintiff being "afforded a clemency proceeding commensurate with the Constitution." *Id*. at 831. Thus, this § 1983 action is the appropriate vehicle for seeking enforcement of the Plaintiffs' federal due process and equal protection rights.

Defendants violated Plaintiffs' federal Constitutional Rights to due process and equal protection during state clemency proceedings.  The United States Supreme Court has recognized that the importance of the clemency process in a capital case cannot be understated: "Far from regarding clemency as a matter of mercy alone, we have called it 'the "fail safe" in our criminal justice system.'" *Harbison v. Bell*, 556 U.S. 180, 192 (2009) (quoting *Herrera v. Collins*, 506 U.S. 390, 415 (1993)). Indeed, "[c]lemency is deeply rooted in our Anglo-American tradition of law, and it is the historic remedy for preventing miscarriages of justice where the judicial process has been exhausted. *Herrera*, 506 U.S. at 390; *see also Dretke v. Haley*, 541 U.S. 386, 399 (2004) (Kennedy, J., dissenting) ("Among its benign if too-often ignored objects, the clemency power can correct injustices that the ordinary criminal process seems unable or unwilling to consider."). Clemency power is "a prerogative granted to executive authorities to help ensure that justice is tempered by mercy." *Cavazos v. Smith*, 565 U.S. 1, 8-9 (2011). When the clemency process is so infected by the improper interference by the prosecution and/or reduced to that of a sham proceeding, as it was here, Louisiana's death penalty scheme is rendered constitutionally defective.

The necessity for the "fail safe" afforded by the clemency process is evident in this case. In the short time since the Governor issued his Directive that the Pardon Board set the 56 Clemency Applications for hearing, the United States Fifth Circuit Court of Appeals affirmed the vacatur of the conviction and death sentence of Jarrell Neal, one of the 56 capital clemency applicants, after

Mr. Neal spent nearly 25 years on Louisiana's death row.[13] Mr. Neal's conviction and death sentence were vacated because the jury never heard critical evidence indicating that Mr. Neal was not the shooter responsible for the underlying crime.[14]

In *Woodard*, 523 U.S. at 288-89, Justice O'Connor, in a plurality opinion, reasoned that as long as the condemned person is alive, he has an interest in his life that the Due Process Clause protects. Justice O'Connor found that the specific procedural flaws Woodard cited did not rise to the level which would trigger a cognizable due process challenge, i.e., that he did not have enough days' notice of his interview after the setting of his warrant; and that he did not have enough time to prepare a clemency petition. *Id.* at 289-90. Each of these criticisms dealt with discrete aspects of the internal structuring of a clemency hearing and are minor in comparison to the complete and improper takeover of the clemency process presented in Plaintiffs' situation.

Based on Plaintiffs' constitutionally protected life interests, they seek enforcement of their due process rights to minimally adequate safeguards under the Fourteenth Amendment in clemency proceedings, including the right to a meaningful opportunity to be heard. Plaintiffs' clemency proceeding arbitrarily lacked minimal due process because they were denied "access to [the] clemency process," *Woodard*, 523 U.S. at 289, due to the Attorney General and District Attorneys' interference. Since the Attorney General has manipulated the Plaintiffs' clemency proceedings to the point of rendering them all but meaningless, Plaintiffs request that this Court enter a preliminary and permanent injunction enjoining the Board from proceeding under the Settlement Agreement with the Attorney General and District Attorneys and instead applying the

---

[13] *See Neal v. Vannoy*, 78 F.4th 775 (5th Cir. 2023).

[14] *Id.* at 780, 791-96.

Board policies and rules, as well as the Governor's Constitutional Directives, consistent with the minimal guarantees of due process.

Louisiana's clemency rules applicable to capital cases demonstrate a clear line of authority to the Governor. The Governor's constitutional authority is plenary. The Louisiana Constitution of 1974, Article IV, § 5(E)(1), provides as follows:

> The governor may grant reprieves to persons convicted of offenses against the state and, upon favorable recommendation of the Board of Pardons, may commute sentences, pardon those convicted of offenses against the state, and remit fines and forfeitures imposed for such offenses.

La. Const. Art. IV § 5(E)(1). The Governor's power to grant clemency is robust. As the Louisiana Supreme Court has explained, "Louisiana's gubernatorial clemency power, which encompasses reprieves, pardons, commutations of sentences and the restoration of full rights of citizenship, is bestowed by the constitution. It is purely a function of the executive branch of government, not subject to limitation or control from the other branches." *See State v. Jones*, 94-0459 (La. 7/5/94), 639 So. 2d 1144, 1150-51 (citing *Bryant v. Louisiana State Pardon Board*, 378 So.2d 180 (La. Ap. 1st Cir. 1979), and *State v. Mehojovich*, 119 La. 791, 44 So. 481 (1907)); *State v. Lee*, 22-KK- 1 827 (La. Sept. 8, 2023), --- So. 3d ---, 2023 WL 5813836, *2, *4 (citing La. Const. art. IV(E)(1)).

The Governor's far-reaching authority to grant clemency extends to capital cases. Indeed, the Louisiana Constitution guarantees the legislature's ability to require courts to inform capital jurors of the possibility that any decision regarding penalty may be commuted by the Governor. *See* La. Const. Art. I, § 16. The legislature made the requirement mandatory. *See* La. C.Cr. P. Art. 905.2(B) ("the court *shall* instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a

sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court *shall* also instruct the jury that under this authority the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon") (emphasis added).

Pursuant to LAC Title 22, Part V, Chapter 213, an application on behalf of a capital inmate must contain the following information: (1) the name of the applicant, together with any pertinent identifying information; (2) identification of the applicant's agents, if any, who are presenting the application; (3) certified copies of the indictment, judgment, verdict of the jury, and sentence in the case, including official documentation verifying the scheduled execution date; (4) a brief statement of the offense for which the prisoner has been sentenced to death; (5) a brief statement of the appellate history of the case, including its current status; (6) a brief statement of the legal issues which have been raised during the judicial progress of the case; (7) the requested length of duration of the stay, which shall be in increments of 30 days, unless a different duration is requested on the basis of the grounds for the application set forth pursuant to §213.A.8; (8) all grounds upon which the basis of which the stay is requested, provided that such grounds shall not call upon the board to decide technical questions of law which are properly presented via the judicial process; and (9) a brief statement of the effect of the offender's crime upon the family of the victim. *See* LAC 22.V:213(A). The written application must be delivered to the Pardon Board's Office. *See* LAC 22.V:213(B).

Once the Board has received an application from a condemned person, the Louisiana Administrative Code provides that "a majority of the board,[15] in written and signed form" may do one of three things: (1) recommend to the governor a reprieve from execution "(which may include a recommendation to commute the sentence to life imprisonment)"; (2) not recommend a reprieve from execution; or (3) set the matter for a hearing as soon as practicable and at a location convenient to the board and the parties to appear before it. *See* LAC 22.V:213(G). As this provision demonstrates, the Pardon Board can make a favorable recommendation to the Governor in a capital case based on the written application and any supplemental materials submitted, which means that the Governor can commute the Death Row inmates' sentences to life imprisonment without the necessity of holding a hearing in each case. Should the Board or the Governor desire a hearing, the Pardon Board Policies with respect to capital cases provide the Governor with unique control over the timing of its meetings or hearings:

> Notwithstanding any provision to the contrary by Board policy, in any case in which the death sentence has been imposed, the Governor may at any time place the case on the agenda and set a hearing for the next scheduled meeting or at a specially called meeting of the Board.

Pardon Board Policy No. 02-207-POL. This provision allows the Governor to put the applications submitted by Death Row inmates before the Board at the same time and in an accelerated time frame. By its express terms, this provision it is not limited to cases with an execution warrant, but includes "any case in which the death sentence has been imposed." *Id.*

The Governor's ability to place cases on the docket is inherent in the executive Pardon Power, and was invoked as a matter of practice before it was expressly recognized in the Board's

---

[15] All provisions of the LAC are subject to waiver by the Board in capital cases, and the Board Policy provides that a decision to commute a death sentence to life imprisonment only requires "a majority of the Board, or a majority thereof." 02-207-POL.

policies.  In 2003, before implementation of Pardon Board Policy 2-207, Governor Mike Foster directed the Pardon Board to set a clemency hearing for Herbert Welcome, who had been sentenced to death.[16] The Board complied with Governor Foster's directive without first conducting an "administrative review."

The Louisiana Administrative Code provides an extra measure of flexibility in capital cases in which clemency is being considered. Pursuant to LAC 22.V: 213(M), which is also reflected in the Board Policy 02-207-POL, all of the requirements related to clemency applications in capital cases can be waived by the Board in order to accommodate exigencies:

> Each of the provisions of this policy are subject to waiver by the board when it finds that there exists good and adequate cause to suspend such provisions and adopt a different procedure which it finds to be better suited to the exigencies of the individual case before it.

LAC 22.V: 213(M). For instance, the Pardon Board Policy regarding the number of members of the Board who must agree regarding clemency in a capital case states that a majority of the Board, "or a majority thereof," shall decide capital applications, indicating that the number of favorable votes is determined by the number of board members present. Pardon Board Policy 02-207-POL. This is also consistent with Pardon Board Directives which state that, in a capital case, "[i]f a Board Member is on leave and out of the country, the Member shall not be required to vote." Pardon Board Dir. 02-208-DIR.

One significant difference between capital cases and non-capital cases is that, in non-capital cases, a hearing is a prerequisite for commutation of sentence.[17] LAC 22.V:203(A)(2). In capital cases, as discussed above, the Board may recommend commutation of sentence even

---

[16] *See* Kerry Myers, *A Hint of Understanding*, THE ANGOLITE, May/June 2003, at 27, attached as Exhibit 13.

[17] "A person may not be considered for a commutation of sentence unless he or she has been granted a hearing by the pardon board and has had his or her case placed upon a pardon board agenda." LAC 22.V:203(A)(2).

without a hearing. *See* LAC 22.V:213(G). In general, however, the Administrative Code sets forth the parameters of hearings before the Pardon Board.[18] The Board may deny a hearing for several enumerated reasons, within its discretion. LAC 22.V:105(A). Where a hearing has not been denied, and the applicant otherwise qualifies for clemency, the Administrative Code provides that, after receipt of all of the required information and documents and clemency investigation, "the board shall set the matter for public hearing." LAC 22.V:211(B). Once a hearing has been granted, the applicant must publish a notice in the newspaper, and may provide any additional information on his or her own behalf. LAC 22.V:209. The Board must notify the trial officials of the parish of conviction, the Attorney General, and the family of the victim, and allow any such individuals, or the designated representatives thereof, the opportunity to attend the hearing and/or to present any relevant information. LAC 22.V:213(H)-(I).

At the hearing itself, up to three witnesses in favor and three against the application may speak, which is limited to 15 minutes of presentation by the parties and 5 minutes of statements by the victim's family. LAC 22:V.213(O). There is no limit to written correspondence from either side. All hearings must be in open session pursuant to requirements of the Louisiana Open Meetings Act. LAC 22:V.213(J). At the conclusion of the hearing, "the board shall render its decision, reached by majority vote, within a reasonable time." LAC 22:V.213(L).

Once a hearing has been granted, there is no provision for revoking a hearing, other than a limited number of specific situations expressly laid out in the polices. to revoke it *See* LAC 22:V.209(H) (automatic denial where the applicant is released from custody prior to the hearing date); LAC 22:V.209(I) (automatic denial where the applicant fails to attend the hearing). No

---

[18] The Pardon Board's capital Directive provides that Board Policy 02-207 governs capital clemency applications "for which a hearing is granted." Board Directive 02-208-DIR. Board Policy 207 is a duplicate of LAC 22.V:213.

provision in the Administrative Code, Revised Statutes, or the Board's Policies and Directives, allows the Board to revoke a granted hearing.

When the state does not comport with its own rules, the state may be in violation of the federal constution's Due Process Clause. *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring). More specifically, that the clemency process in *Woodard* comported with Ohio's regulations was a primary reason that Justice O'Connor found no due process violation in that case. *Id*. at 290 (O'Connor, J., concurring). Additionally, Justice O'Connor highlighted the type of process the petition received—namely "notice of the hearing and an opportunity to participate in an interview"—in determining that there was no due process violation. *Id*. In other words, Justice O'Connor's language strongly suggests that, had Ohio's clemency process not provided notice or an opportunity to be heard, in the petitioner's case through an interview, Ohio's process would not have satisfied the minimal due process requirement. The minimal due process required of clemency thus demands at least sufficient notice and an opportunity to be heard during the clemency process. *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotations omitted)); *see also Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). The Board's violation of its own rules to cancel scheduled hearings and preclude any additional hearings from being scheduled violated Plaintiffs' rights to due process.

A meaningful opportunity to be heard also requires an impartial decisionmaker. *See Wolff v. McDonnell*, 418 U.S. 539, 559 (1974) (holding that in a parole revocation hearing, minimal due process imposed certain minimal procedural requirements that included a "neutral and detached hearing body . . . ." (internal quotations omitted)); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (holding that citizen enemy combatants are afforded some due process, which includes "a

18

neutral decisionmaker"). Where the decisionmaker's process has been hijacked by members of the prosecution, specifically the Louisiana Attorney General, who not only served as the Board's counsel but also sued the board, fired the Board's independent counsel, and supplanted independent counsel with hand-picked counsel who shepherded the Board into an unlawful Settlement Agreement, the applicants have no meaningful opportunity to be heard or fair consideration of their applications before an impartial decisionmaker.

These new, unwritten procedural hurdles would be applied for the first time, retroactively, to Plaintiffs, in violation of their rights to equal protection. In the history of the death penalty in Louisiana, the Pardon Board has rarely recommended clemency for a capital applicant, but (1) has followed its own rules when considering capital clemency applications; (2) has either held a hearing before deciding the merits of the application, or (3) denied the application on the merits without a hearing. Never has the board granted a hearing, either on its own accord or at the lawful directive of the governor, and then rescinded the hearing. These new procedural hurdles, unwritten rules, and rescissions of hearings, intentionally violate the Governor's directive, serve as substantive infringement of Plaintiffs due process rights.

Defendants' misconduct also violated the separations of power.  By violating the Governor's directive and entering into a void and unenforceable settlement, Defendants arbitrarily and unconstitutionally deprived Plaintiffs of their constitutional rights.

Defendants' misconduct also continues to violate Plaintiffs' constitutional rights pursuant to the Eighth Amendment.  Defendants intentional violation of the Governor's directive continuously exposes them to unreasonable and excessive punishment.

Defendants' settlement also operates as an intentional violation of Plaintiffs' due process and eighth amendment rights.

**B.      Plaintiffs face a substantial threat if the preliminary injunction is denied.**

The clemency hearings provide an opportunity to commute a death sentence to life in prison.  If the clemency hearings do not occur, then Defendants do not issue a recommendation to the Governor.  Without a recommendation (whether for or against clemency), the Governor is precluded from exercising his constitutional authority to determine whether to commute any of Plaintiffs' sentences.  As a result, Plaintiffs face the very real possibility of death if this preliminary injunction is not granted.

**C.      Plaintiffs' threatened injuries outweigh any threatened injury Defendants may experience from issuing a preliminary injunction.**

While Plaintiffs face the greatest risk if a preliminary injunction does not issue, Defendants face none. An injunction would merely require Defendants to perform the roles for which they were appointed – conduct clemency hearings and provide recommendations to the Governor.  Each clemency hearing can be completed <u>in less than hour</u>.  Typically, Defendants vote on the recommendation immediately following the hearing.  Defendants have already scheduled at least 15 clemency hearings before cancelling them and replacing them with administrative reviews.

**D.      Issuing a preliminary injunction will not disserve the public interest.**

By issuing a preliminary injunction, this Court will serve the public interest by enforcing the Governor's constitutional authority to grant clemency.  The public's overriding interests include ensuring that its laws are followed, that its state constitution is given full effect, and that its Governor exercises the powers afforded to him.  The public also enjoys the interest that a state board of the executive branch follow the Governor's directive.

The public also has an interest in ensuring that the criminal justice system operates as intended and does not waste resources.  Plaintiffs' death penalty appeals result in years of

litigation, cycles of appeals, significant attorneys' fees, and heavy costs.  If the Governor decides to commute any of Plaintiffs sentences, the litigation costs will meaningfully (if not completely end) for the public for those specific cases.

Conversely, not conducting clemency hearings does not serve any public interest. Defendants will be doing the job for which they were appointed.  They will be issuing advisory recommendations to the Governor who will decide whether to commute any of Plaintiffs' sentences.

## **RELIEF REQUESTED**

Plaintiffs submit that a preliminary injunction be entered in favor of Plaintiffs and against all Defendants in their official and individual capacities, jointly and *in solido*, and that this Court:

1.      Enjoin Defendants from violating the Governor's directive to conduct clemency hearings for Plaintiffs;

2.      Enjoin Defendants from converting the currently noticed clemency hearings into administrative reviews;

3.      Enjoin Defendants from failing to schedule clemency hearings for Plaintiffs whose clemency hearings have not been scheduled to ensure that the clemency hearings are completed by **December 28, 2023**; and

4.      Conduct oversight of the clemency hearings to ensure that they are conducted fairly without arbitrariness.

## **CONCLUSION**

For all of the foregoing reasons and those stated in the Complaint, Plaintiffs pray that a preliminary inunction issue pursuant to *Federal Rule of Civil Procedure* 65 as stated above.

Filed: October 17, 2023

**RESPECTFULLY SUBMITTED:**

/s/ Soren Gisleson
SOREN E. GISLESON
La Bar No. 26302 (T.A.)
HERMAN, HERMAN & KATZ
909 Poydras, Ste. 1860
New Orleans, Louisiana 70112-4060
Tel: (504) 581-4892; Fax: (504) 561-6024
sgisleson@hhklawfirm.com

***Attorney for Todd Wessinger***

/s/ D. Aaron Novod
D. Aaron Novod 31275
Law Office of D. Aaron Novod
P.O. Box 740985
New Orleans, LA 70174
(504) 913-3746
aaron.novod.esq@gmail.com

***Attorney for Christopher Sepulvado,***
***Anthony Bell ; Daniel Irish, Jason Reeves ;***
***Allen Robertson; and Manuel Ortiz***

/s/Nicholas Trenticosta
Nicholas Trenticosta LSBA No. 18475
7100 St. Charles Ave.
New Orleans, LA  70118
(504) 352-8019
nicktr@bellsouth.net

***Attorney for James Copeland and Winthrop***
***Eaton***

/s/ Cecelia Kappel
Cecelia Trenticosta Kappel, La. Bar No. 42736
1024 Elysian Fields Ave.
New Orleans, LA 70117
(504) 529-955
ctkappel@efendla.org

***Attorney for David Bowie; Gregory Brown;***
***Jeffrey Clark; Nathaniel Code; Kevin***
***Daigle; Darrell Draughn; Cedric Edwards;***
***Jessie Hoffman; Kyle Joekel; Jeremiah***
***Manning; Lee Roy Odenbaugh; Larry Roy;***
***Donald Wright***

/s/ John Neeleman
John Neeleman
KILPATRICK TOWNSEND
1420 Fifth Avenue, Suite 3700
Seattle, WA  98111-9402
Direct: 206.626.7713; Mobile: 206.349.5763
**To be Admitted PHV**
***Attorney for Quincy Broaden***

/s/Sarah Ottinger
Sarah Ottinger La. Bar No. 24589
Attorney at Law
2563 Bayou Road, 2nd Floor
New Orleans, LA 70119
(504) 258-6537

***Attorney for Henri Broadway & Jessie***
***Hoffman***

/s/ Matilde Cabria
Matilde Jean Carbia, LA Bar Roll No. 32834
Mwalimu Center for Justice
1340 Poydras St., Suite 1700
New Orleans, LA 70112
Tel: 504-212-2110; Fax: 504-212-4540
mcarbia@mcfj.org

*Attorney for Scott Bourque; Quincy Broaden; David Brown; Laderrick Campbell; Sedwric Clark; Michael Cooks; Frank Cosey; Percy Davis; Curtis Deal; Clifford Deruise; Felton Dorsey; Jimmy Duncan; James Dunn; Michael Garcia; Clarence Harris; Dacarius Holliday; Glynn Juniors; Tracy Lee; Donald Leger; Julius Lucky; Jesse Montejo; Marcus Reed; Chris Sepulvado; Willie Tart; Antoine Tate; Emmett Taylor; Michael Taylor; Lamondre Tucker*

/s/ Letty S. Di Giulio

Letty S. Di Giulio, LSBA No. 29836
LAW OFFICE OF LETTY S. DI GIULIO
8630 Oak Street
New Orleans, Louisiana 70118
Phone: (504) 571-5929
Fax: (504) 571-5437
letty@lettydigiulio.com

*Attorney for Daniel Blank, Antoinette Frank and Bobby Hampton*

/s/ Shawn Nolan
Shawn Nolan, PA Bar No. 56353
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Shawn_Nolan@fd.org
**To be Admitted PHV**

*Attorney for James Tyler*