IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ALLEN ROBERTSON, et al ) | NO. 23-1494 |
| *Plaintiffs* ) | |
| v. ) | JUDGE: DICK |
| ) | |
| LOUISIANA BOARD OF PARDONS, et al ) | MAG. JUDGE: BOURGEOIS |
| *Defendants* | |

**PLAINTIFFS' REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**

NOW INTO COURT come Plaintiffs through undersigned counsel who submit the instant *Reply Memorandum in* Support *of Preliminary Injunction*. The Board's Opposition rests on three errors. First, the Board erroneously concludes that the Governor does not have the authority (Constitutional, statutory, or administrative) to instruct the Board to schedule clemency hearings. Second, the Board argues the erroneous factual conclusion that the Governor's August 9th letter to the Board did not instruct them to "place" clemency hearings on their docket. Third, the Board fails to acknowledge the "liberty interest" that the Supreme Court and the Fifth Circuit have recognized an applicant possesses during the clemency process to be free from governmental interference.

**I.    The Governor has the Constitutional, statutory, and administrative authority to "place" a capital case on the Pardon Board's docket for a clemency hearing.**

In its Opposition, the Board's opening argument is that "the Board alone holds the power to determine whether or not one is afforded a clemency hearing," and the Governor does not have the authority to direct it to schedule clemency hearings. [Doc. 25 at 6, 7]. The Board's only authority for this position, however, is Title 22, Pt. V § 105, of the Administrative Code, which merely provides for the Board's "discretionary authority," fails to state that its authority is exclusive to the Board, and otherwise includes the disclaimer that "nothing [in this chapter] shall prevent the board from hearing a case." *Id.* (emphasis supplied).

1

Moreover, the Board's authority is always subject to the superior legal authority of the Governor. The Governor's clemency power is granted by the Louisiana Constitution, enshrined in Louisiana's Revised Statutes, and given effect by the Board's Directives and Policies. La. Const. Art. IV § 5(E)(1) ("the Governor may . . . upon favorable recommendation of the Board of Pardons, commute sentences . . . ."); LA REV. STAT. § 15:572(A) (same); *Directive* 01-114-DIR (defining Directives and Policies). The Board has approved specific Directives and Policies for the filing and review of clemency applications in capital cases, but, as the Board's capital Directive itself recognizes, the Governor's authority is paramount: "In accordance with the Louisiana Constitution, an offender who is convicted and sentenced to death may request clemency from the Governor. The Board shall review all such requests in accordance with this directive." *Directive* 02-208, attached as Exhibit 1.

While the Board generally has discretion to administratively review clemency applications and determine whether a hearing is appropriate, *in a capital case*, the Governor has the authority to set the case for a clemency hearing, thereby bypassing the Board's discretion to deny a hearing. Policy 02-207 provides: "<u>in any case in which the death sentence has been imposed, the Governor may at any time place the case on the agenda and set a hearing for the next scheduled meeting or at a specially called meeting of the Board</u>." *Policy* 02-207 (emphasis supplied), attached as Exhibit 2. Once the Governor requests that a capital case be set for a clemency hearing, the Board no longer has any discretion to decide whether to grant a hearing. Instead, the Board's only act becomes ministerial, not discretionary: the Board must schedule the hearing and make a good faith recommendation to be sent to the Governor.

In its Opposition, the Board recognizes these special rules for capital cases but misconstrues their operation, arguing that a "hearing" as stated in Policy 02-207 does not mean

2

a "hearing." [Doc. 25 at 6-7]. The Board's current position is directly contradicted by its actions following the Governor's letter when it immediately placed the capital cases on the docket for full clemency hearings, not administrative reviews. Only after the Attorney General interfered in the lawful process and sued the Board did the Board, without any legal authority, convert the Governor's instruction to conduct a hearing into a decision for an "administrative review." The Board's only permissible action was to follow through on the ministerial act of scheduling the hearing and issue good faith recommendations. Any other interpretation would undermine the state constitution and state law that empowers the Governor to make clemency decisions.

Moreover, after the Governor "places" a capital case on the Board's agenda and schedules "a hearing," Pardon Board Policy 02-207(B)(10) provides that, at the conclusion of the hearing, the Board shall render a decision by a majority vote whether to recommend a reprieve which may also include a commutation of sentence. POL 02-207(B)(10), attached as Exhibit 2. Contrary to the Board's Opposition, a "hearing" is not the same as an administrative review, and the end result of a clemency hearing is a vote on whether or not to recommend clemency. Indeed, Board Policy 207 provides that the Board may decide whether or not to grant a reprieve and a commutation *based on the written submissions alone*, or *it can do so following a "hearing,"* but it does not provide for a "hearing" to decide whether a "hearing" will be granted.[1]

Nor does the Board's argument that the Administrative Code's notice requirements confirm its position have merit. To the contrary, the capital provisions provide a different scheme for notification once a hearing has been granted than is provided by 22 LAC Pt V, § 211(c) cited by

---

[1] Significantly, the Board in its Opposition does not assert that it has ever previously held a hearing to decide whether a hearing will be held; rather, the Board acknowledges that, until these cases, "the administrative review process was conducted by the board outside of the Board's public hearings[,]" and the Board "recently decided to conduct said hearings at the public hearings." [Doc. 25 at 11]. A review of every case before *and* after these cases were converted to "administrative hearings" establishes the anomalous and, ultimately, unlawful way in which the capital cases are being handled.

3

the Defendants. *See Board Policy 02-207(B)(7)*. In fact, La. R.S. § 15:572.4, which trumps the Administrative Code, provides a 30-day notice requirement rather than a 60-day notice, and this timeline is also reflected in the Board's Policies. In light of this authority, the Board's reliance on § 211 is misplaced.

Ultimately, the Louisiana Constitution, Revised Statutes, and the Board's own Directives and Policies clearly establish that the Governor has the power to "place" clemency hearings for death row inmates on the docket for a hearing, that the Board lacks discretion to ignore that instruction, that the Board's only act is ministerial in nature, that the Board must schedule those hearings, and then the Board must vote on the merits of the clemency application in good faith.

**II.     The Governor's letter to the Board instructed it to schedule clemency hearings.**

In its Opposition, the Pardon Board argues that the Governor's August 9th letter was more of a "suggestion" to schedule clemency hearings than a "directive". The Board's argument assumes that it must be a "directive" or some kind of "order" for Policy 02-207 to become effective. However, Policy 02-207 merely states that the Governor can "place the case on the agenda and set it for hearing." The Governor does not need to use language tantamount to a "directive," "order," or "formal proclamation." The Governor, after all, is speaking to a board within his own executive branch. "Placing a case on the agenda and set for hearing" confers nothing more than communicating (a) whose case to set for hearing and (b) when it should be set for hearing. No magic or talismanic language is required, and no official form needs to be submitted.

Here, the Governor communicated to the Board that he wanted all death penalty cases to be set for hearing. In the very first sentence of his letter, the Governor identified which applications he wanted the Board to consider, he provided the exact number of applicants, and the

4

nature of their crimes: "I write you today about the clemency applications that were recently submitted asking the Board to consider the recommendation of commutation for the 56 incarcerated people at Louisiana State Penitentiary who have been sentenced to death and are awaiting execution." *LTR Governor to Board*, at 1 (08/09/23) (emphasis supplied), attached as Exhibit 3. There is no mistaking whose applications he wanted to be set for hearing.

He asked not only that they be "considered" but that they be set for hearing: "I am asking the Board to set these cases for hearing in a manner least disruptive to the non-capital cases currently pending before the Board." *Id.* at 1 (emphasis supplied). The Governor then spends the next page and a half discussing his beliefs on the death sentence, recognizing that any Board policy seeking to limit to one year would be unconstitutional, against the law, and conflict with the Boards' other policies. *Id.* at 1-3.

The Governor's letter also identified (in a respectful manner) when they should be set for hearing: "in a manner least disruptive to non-capital applications". *Id.* at 1 & 3. The Governor's letter, however, does not express any intent to not schedule these death row clemency hearings if they are in any way disruptive – but to just find the least disruptive manner possible.[2] A plain reading of this letter unequivocally concludes that it (a) identifies which clemency applications to set for hearing and (b) when to set them.

### III.     Plaintiffs are substantially likely to succeed on the merits.

In its Opposition, the Board sets up a straw man to only take him down with mostly inapplicable caselaw. Board's mischaracterizes Plaintiffs' arguments as a set of attacks on the

---

[2] In one section of the Opposition, the Board argues that the litigation has caused the cancellation of non-capital hearings. Besides not providing any evidence, documents, names, or explanation for this baseless statement, the Board fails to acknowledge that it was the state's interference with the lawful clemency processes – in filing a sham lawsuit against the Board – that resulted in any delays. To be sure, the Board had scheduled the capital clemency hearings on days that it was not intending to hold any pardon hearings, proving that it could do both non-capital and capital clemency hearings side-by-side. As of this date, there are also no clemency hearings scheduled for December at all.

adequacy of the clemency process and then knocks it down with unremarkable law that says clemency applicants are not allowed to challenge the denial of their applications. The Board ignores the unprecedented governmental interference to Plaintiffs' legal interest.

The Attorney General and District Attorneys have interfered with the clemency process at every step, culminating in an unconstitutional Settlement Agreement drafted and recommended to the Board by conflicted civil lawyers without experience in criminal, death penalty, or clemency law who concurrently represent the Attorney General. The settlement purports to bind the Board to intentionally violate Governor Edward's constitutional authority. Because the Board is proceeding under this unlawful agreement, it is directly interfering with the Plaintiffs' access to the state's clemency process in violation of due process.

    **A.** ***Woodard* holds that a capital clemency applicant's due process is violated by state action which deprives the applicant of access to the clemency process.**

Government interference in the clemency process undermines the fairness of the proceedings, public confidence in a just outcome, and throws into question the viability of the entire capital punishment scheme which relies on mercy as a last resort. When a state actor interferes with the clemency process to obstruct the applicant's access to clemency, the state violates due process.

In *Ohio Adult Parole Auth. v. Woodard*, the Supreme Court concluded that some level of procedural due process protection applies to capital clemency proceedings. 523 U.S. 272 (1998). While a majority held that the procedure at issue in the instant case did not violate due process, both Justice O'Conner's concurring opinion and Justice Stevens' dissent agreed that a capital clemency applicant possesses a life interest that is protected by the due process clause, and if the state adopts a clemency process as a part of its death penalty system, that process must comport with the Due Process Clause. *Id.* at 288 (O'Conner, J., concurring) & 292 (Stevens, J., dissenting). Justice O'Conner's opinion gives two examples of clemency procedures that would violate due process – a flip of a coin, and a scheme where the state arbitrarily denied the prisoner access to the

clemency process. *Id*. at 289 (O'Conner, J., concurring). While the former scenario envisions a process that is entirely arbitrary, the latter involves obstruction by the state to prevent the prisoner from availing himself of the state procedures.

> **B. Courts have held that claims of government interference with the clemency process are distinct from claims of otherwise flawed procedures.**

There is a significant difference between a claim that a state's clemency procedures are arbitrary and unfair, and a claim that state actors have actively interfered to prevent the applicant from making use of state clemency procedures. However, permitting government interference with an applicant's ability to avail himself of the state procedures would lead to an arbitrary result. As such, Justice O'Conner's two examples are best read as prohibiting government officials from deliberately limiting clemency applicants' access to existing procedures.

Courts have rarely granted claims for relief based on arbitrary clemency procedures. In *Woodard* itself, the Supreme Court found no due process violation where the applicant was given only ten days' notice of his capital clemency hearing and was not guaranteed that his counsel had the right to participate. *Id*. at 290 (O'Conner, J., concurring). When a state enacts a clemency process as part of its scheme of capital punishment, however, state clemency applicants have a liberty interest in the fair application of those rules—that means that the determination of clemency must not be wholly arbitrary and capricious, and it must be free of interference by the prosecution.

At a baseline, due process guarantees that a death row prisoner "receive the clemency procedures explicitly set forth by state law." *Duvall v. Keating*, 162 F.3d 1058, 1061 (10th Cir. 1998). When the state interferes with the fair application of the state clemency procedures, the applicant's due process rights are violated. As set forth above, the undersigned Plaintiffs did not receive even the baseline of due process as they were denied the process that is explicitly set forth by state law.

7

In *Wilson v. U.S. Dist. Ct. for N. Dist. of California*, state officials provided inaccurate information about the relevant issues to be considered at the applicant's clemency hearing. 161 F.3d 1185, 1187 (9th Cir. 1998). The Ninth Circuit found that the fact "that the state's communications misled his counsel" stated a due process claim under *Woodard*. *Id*. The Ninth Circuit in a subsequent decision expounded upon potential scenarios that would violate due process and included circumstances where a state's clemency procedures were "infected" by "personal or political animosity," among other scenarios. *Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002).

The Eighth Circuit has agreed that government interference in capital clemency process violates due process. In *Young v. Hayes*, a state prosecutor threatened to fire an attorney if she submitted a statement in support of the applicant's capital clemency application. 218 F.3d 850, 851 (8th Cir. 2000). In evaluating the claim, the court distinguished this claim from a situation where the applicant complains of the outcome of the proceedings: "The claim here is that the State . . . has deliberately interfered with the efforts of petitioner to present evidence to the Governor." *Id*. at 853. The court found that the applicant had properly stated a claim under 42 U.S.C. § 1983. *Id*.

> The court later explained:
>
> Because clemency is extended mainly as a matter of grace, and the power to grant it is vested in the executive prerogative, it is a rare case that presents a successful due process challenge to clemency procedures themselves. On the other hand, <u>if the state actively interferes with a prisoner's access to the very system that it has itself established for considering clemency petitions, due process is violated</u>.

*Noel v. Norris*, 336 F.3d 648, 649 (8th Cir. 2003) (citing *Woodard*, 523 U.S. at 280–81) (emphasis added). As in *Young v. Hayes*, the Attorney General in the instant matter fired the counsel selected by the Board in order to directly interfere with the outcome of the lawful clemency process.

### C. The Fifth Circuit recently held that a parole applicant has a liberty interest.

Subsequent to the filing of the Complaint in this matter, the Fifth Circuit handed down the decision in *Galbraith v. Hooper*, No. 22-30159, 2023 WL 6968754 (5th Cir. Oct. 23, 2023). Galbraith was unanimously granted parole by the Louisiana Parole Board in November of 2017. The district attorney filed several unsuccessful requests for reconsideration of the parole grant, including a report that the plaintiff had been involved in several cold-case murders, and aired his grievances in the media. *Id*. at *2. Galbraith's release date was set for April 23, 2017. But, just days before the release date, an email exchange occurred between a lobbyist and the Governor's executive counsel expressing concern about the negative media reports. The same day, a single member of the parole board rescinded the parole grant due to an alleged irregularity with victim notice. In a unanimous opinion, the Fifth Circuit reinstated Galbraith's parole. First, the Fifth Circuit concluded that a liberty interest may arise from an expectation created by state laws or policies. *Id*. at *11. The court explained that "a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State." *Id*. (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). The purpose of due process protection, the Court stated, is to shield a person against arbitrary government action. *Id*. Second, the Court found that the Board's rescission of Galbraith's parole was not consistent with its explicit rules and could not be rescinded on any other basis. *Id*. at *12.

The Fifth Circuit's opinion in *Galbraith* is instructive in this case. Where the state enacts rules applicable to capital clemency proceedings, the state has a due process obligation to apply those rules without influence or interference by state actors. Galbraith's claim was not that he disagreed with the board's discretionary decision, but that the state had unconstitutionally interfered with his parole process and that his liberty interest was harmed as a result.

9

Here, we see a similar pattern of state interference and failure to apply the relevant Board rules. Like in *Galbraith*, AG Landry and other prosecutors immediately took to the media to air their grievances with the fact that death-sentenced individuals applied for clemency. Worse than *Galbraith*, but similar to the situation in *Wilson*, *supra*, 161 F.3d 1185, employees of the Attorney General's office then "advised" the Board members that they could not hear the capital clemency applications. When the Board set hearings at the lawful direction of the Governor, the Attorney General and other prosecutors filed a sham lawsuit against the Board. When the Board prepared to defend against the lawsuit with unconflicted counsel who agreed with the capital applicants, the Attorney General fired the Board's lawyer and installed his own hand-picked lawyers, who "settled" the lawsuit within 24 hours. The Settlement between the Board, the District Attorneys, and the Attorney General mandates that the Board proceed in a way that is contrary to all policies and directives of the Board and contrary to Governor Edward's order to hold hearings on the clemency applications.[3]

Plaintiffs are all death-sentenced individuals who have relied on Louisiana's capital clemency process and rules for notice of how their clemency applications will be decided. They have a liberty interest in their lives and also in the state's application of these rules in a fair way. *See Galbraith*, slip op. at *12. Where state actors have interfered with the clemency process to obstruct the fair consideration of the plaintiffs' clemency applications, due process has been violated, and the process has been rendered unconstitutionally arbitrary and capricious in violation of the Eighth Amendment of the United States Constitution.

---

[3] In addition to the violations of policies noted above, pursuant to the Settlement Agreement, the Board is prohibited from scheduling "any additional clemency applications for administrative review hearings before December 31, 2023 and will not add any additional applications to the currently scheduled hearing dates." *Settlement Agreement*, § 1.2.

10

**WHEREFORE** Plaintiffs respectfully requests that the Court enter the preliminary injunction as prayed for.

**RESPECTFULLY SUBMITTED:**

/s/ Soren Gisleson
SOREN E. GISLESON
La Bar No. 26302 (T.A.)
HERMAN, HERMAN & KATZ
909 Poydras, Ste. 1860
New Orleans, Louisiana 70112-4060
Tel: (504) 581-4892; Fax: (504) 561-6024
sgisleson@hhklawfirm.com

*Attorney for Todd Wessinger*

/s/ D. Aaron Novod
D. Aaron Novod 31275
Law Office of D. Aaron Novod
P.O. Box 740985
New Orleans, LA 70174
(504) 913-3746
aaron.novod.esq@gmail.com

*Attorney for Christopher Sepulvado, Anthony Bell ; Daniel Irish, Jason Reeves ; Allen Robertson; and Manuel Ortiz*

/s/Nicholas Trenticosta
Nicholas Trenticosta LSBA No. 18475
7100 St. Charles Ave.
New Orleans, LA 70118
(504) 352-8019
nicktr@bellsouth.net

*Attorney for James Copeland and Winthrop Eaton*

/s/ Cecelia Kappel
Cecelia Trenticosta Kappel, La. Bar No. 32736
1024 Elyian Fields Ave.
New Orlens, LA 70117
(504) 5295955
ctkappeldefendla.org

*Attorney for David Bowie; Gregory Brown; Jeffrey Clark; Nathaniel Code; Kevin Daigle; Darrell Draughn; Cedric Edwards; Jessie Hoffman; Kyle Joekel; Jeremiah Manning; Lee Roy Odenbaugh; Larry Roy; Donald Wright*

/s/ John Neeleman
John Neeleman
KILPATRICK TOWNSEND
1420 Fifth Avenue, Suite 3700
Seattle, WA 98111-9402
Direct: 206.626.7713; Mobile: 206.349.5763
**To be Admitted PHV**
*Attorney for Quincy Broaden*

/s/Sarah Ottinger
Sarah Ottinger La. Bar No. 24589
Attorney at Law
2563 Bayou Road, 2nd Floor
New Orleans, LA 70119
(504) 258-6537

*Attorney for Henri Broadway & Jessie Hoffman*

| | |
|---|---|
| /s/ Matilde Cabria<br>Matilde Jean Carbia, LA Bar Roll No. 32834<br>Mwalimu Center for Justice<br>1340 Poydras St., Suite 1700<br>New Orleans, LA 70112<br>Tel: 504-212-2110; Fax: 504-212-4540<br>mcarbia@mcfj.org<br><br>*Attorney for Scott Bourque; Quincy Broaden; David Brown; Laderrick Campbell; Sedwric Clark; Michael Cooks; Frank Cosey; Percy Davis; Curtis Deal; Clifford Deruise; Felton Dorsey; Jimmy Duncan; James Dunn; Michael Garcia; Clarence Harris; Dacarius Holliday; Glynn Juniors; Tracy Lee; Donald Leger; Julius Lucky; Jesse Montejo; Marcus Reed; Chris Sepulvado; Willie Tart; Antoine Tate; Emmett Taylor; Michael Taylor; Lamondre Tucker* | /s/ Letty S. Di Giulio<br>Letty S. Di Giulio, LSBA No. 29836<br>LAW OFFICE OF LETTY S. DI GIULIO<br>8630 Oak Street<br>New Orleans, Louisiana 70118<br>Phone: (504) 571-5929<br>Fax: (504) 571-5437<br>letty@lettydigiulio.com<br><br>*Attorney for Daniel Blank, Antoinette Frank and Bobby Hampton*<br><br>/s/ Shawn Nolan<br>Shawn Nolan, PA Bar No. 56353<br>Federal Community Defender Office<br>for the Eastern District of Pennsylvania<br>601 Walnut Street, Suite 545 West<br>Philadelphia, PA 19106<br>(215) 928-0520<br>Shawn_Nolan@fd.org<br>**Admitted PHV**<br><br>*Attorney for James Tyler* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 3, 2023, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system and was thus served automatically upon all counsel of record in this matter.

/s/ Soren Gisleson